IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CARLOS YBARRA, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. NO. C-07-329 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of the Social Security | § | |
| Administration, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION TO
<u>GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Carlos Ybarra brought this action for review of the Commissioner's final decision that he is not entitled to Title II Disability Insurance Benefits ("DIB"), or Title XVI Supplemental Security Income Benefits ("SSI"). (D.E. 4). On October 26, 2007, defendant answered his complaint. (D.E. 6). On December 5, 2007, defendant filed a motion for summary judgment with a brief in support of the motion. (D.E. 10, 11). On December 13, 2007, plaintiff filed a brief in support of his original complaint, which was construed as a cross-motion for summary judgment. (D.E. 12). On January 2, 2008, defendant filed a response to plaintiff's cross-motion, (D.E. 13), to which the plaintiff replied on January 11, 2008. (D.E. 14). For the reasons stated herein, it is respectfully recommended that plaintiff's cross-motion be granted.

## I.  JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).

## II.  BACKGROUND

**A.**  **Procedural History**.

On September 18, 2003, plaintiff filed an application for DIB and SSI beginning on May 4, 2001.  Administrative Record ("AR") at 69.  He claimed that he was unable to work due to pain in his knees and back, diabetes, hypertension, depression, and bursitis in his left hip.  Id. at 85.  On December 11, 2003, his initial application was denied because his "condition was not severe enough to keep [him] from working."  Id. at 38.  On May 21, 2004, plaintiff's application was denied on reconsideration, after review by an independent state agency physician and disability examiner.  Id. at 40.  This denial again explained that his "condition was not severe enough to keep [him] from working."  Id. at 44.

On June 21, 2004, plaintiff requested review by an administrative law judge ("ALJ").  Id. at 45.  On July 27, 2006, the ALJ conducted a hearing on the denial.  Id. at 573.

On August 21, 2006, the ALJ denied benefits, id. at 13, finding that plaintiff had not engaged in substantial gainful employment, and suffered from severe,

medically determinable impairments.  <u>Id.</u> at 18.  However, he found that they did

not meet or exceed the criteria for any listed impairment, <u>id.</u> at 21, that plaintiff

was able to perform a limited range of light work, and that there were jobs existing

in significant numbers in the national economy that plaintiff could perform.  <u>Id.</u> at

26.  On October 2, 2006, plaintiff requested that the Appeals Council review the

ALJ's decision.  <u>Id.</u> at 11.  On June 4, 2007, the Appeals Council denied the

request for review, making the ALJ's denial the Commissioner's final decision.

<u>Id.</u> at 5.  On August 2, 2007, plaintiff filed this action.

**B.     Plaintiff's Medical Records**.

On February 16, 2001, plaintiff sustained a "twisting injury" to his right

knee after falling from a ladder while working as a pipefitter.  <u>Id.</u> at 128.  The

company doctor told him that he had a knee sprain, and could return to light duty.

<u>Id.</u>  However, his employer did not have any light work, so he returned to his

normal job and avoided kneeling, squatting, and using ladders.  <u>Id.</u>  He began using

a cane on weekends.  <u>Id.</u>

On March 26, 2001, Dr. Lawrence Wilk suggested an MRI scan because

plaintiff's pain level hindered his own examination.  <u>Id.</u> at 127.  A March 30, 2001

MRI revealed a joint effusion,[1] a discoid lateral meniscus,[2] and an extensive tear of the posterior horn of the medial meniscus.  Id. at 132-33.  Plaintiff underwent arthroscopic surgery on May 9, 2001.  Id. at 126.  On June 7, 2001, Dr. Wilk reported that plaintiff was "fully ambulatory," and walking without a limp.  Id. Plaintiff's surgeon expected him to return to his regular job on August 6, 2001.  Id. at 130.

On August 9, 2001, Dr. Edward T. Nurse, D.C. performed an initial examination on plaintiff.  Id. at 140.  Plaintiff's prognosis was guarded, and Dr. Nurse recommended temporary total disability.  Id. at 142.  On September 28, 2001, Dr. Nurse reported that plaintiff had progressed about fifty-five percent, and his prognosis had improved to poor-fair.  Id. at 139.

On August 15, 2001, plaintiff saw Dr. Joel Joselevitz for his knee pain.  Id.

---

[1] An "effusion" is "the escape of fluid into a part or tissue."  Dorland's Illustrated Medical Dictionary 571 (29th ed. 2000) [hereinafter Dorland's].

[2] A "discoid lateral meniscus" is "a semilunar lateral meniscus of the knee that has been transformed into a thickened, irregular discoid mass as a result of excess motion of the meniscus, which in turn results from congenital absence of attachment of the posterior horn of the meniscus to the tibial plateau.  The excess motion also causes a clicking sound on flexion and extension of the knee."  Dorland's, at 1085.

at 166.  Dr. Joselevitz prescribed Celebrex[3] and Ultram.[4]  Id. at 167.  On September

14, 2001, plaintiff still complained of severe pain.  Id. at 165.  He had slipped and

fallen, aggravating his condition.  Id.  Dr. Joselevitz continued to treat him with

Celebrex and Ultram, and prescribed TENS[5] unit supplies.  Id.  On October 12,

2001, patient's pain level was five (out of ten).  Id. at 164.  He completed a pain

inventory, which revealed a sixty percent interference with work activities, a fifty

percent interference with general activities of daily life, and a forty percent

interference with his mood, interpersonal relations, and ability to sleep, and

concentrate.  Id.  On November 12, 2001, he complained of constant, severe pain

that he described as "stabbing, tiring, penetrating,[and] miserable...."  Id. at 163.

On February 11, 2002, his pain level was a four, and Dr. Joselevitz prescribed

Norco.[6]  Id. at 162.  On March 13, 2002, plaintiff reported that he had improved

significantly and planned to "try to participate in more recreational activities such

---

[3] "Celebrex" is "a nonsteroidal anti-inflammatory drug."  Physician's Desk Reference 3134 (61st ed. 2006) [hereinafter PDR].

[4] "Ultram" is "a centrally-acting synthetic analgesic."  PDR, at 2392.

[5] "TENS" is an acronym for "Transcutaneous Electrical Nerve Stimulator."  The electrical currents it produces can prevent pain from being transmitted to the brain. See http://arthritis.about.com/od/assistivedevicesgadgets/g/tensunit.htm.

[6] "Norco" is the generic name for Vicodin, a combination of the narcotic hydrocodone and acetaminophen.  PDR, at 535.

as golf." Id. at 161.

On March 26, 2002, plaintiff's pain level was four, but he was leaving town to take a "craft test" to return to work. Id. at 160. However, on April 30, 2002, he reported that he did not pass his physical examination because he could not climb stairs. Id. at 159. His pain level was still a four. Id. On July 26, 2002, he reported that he was actively searching for work. Id. at 156. On August 30, 2002, he reported that his current medication was not controlling the pain, which was a four or five out of ten. Id. at 157. Dr. Joselevitz discontinued Celebrex and Norco, and started plaintiff on Bextra.[7] Id. On January 27, 2003, plaintiff requested Celebrex and Norco instead of Bextra and Ultram, because they were no longer controlling the pain. Id. at 154A.

On March 25, 2003, Dr. Joselevitz prescribed a walking cane because plaintiff was having difficulty walking. Id. at 153. He considered the cane to be "medically necessary as part of his integral rehabilitation program." Id. On April 22, 2003, plaintiff reported that the cane was helping, and that his pain level was now a three, with the medications. Id. at 152. Dr. Joselevitz recommended that plaintiff begin using a stationary bicycle, if feasible. Id. On May 22, 2003,

---

[7] "Bextra" is a nonsteroidal anti-inflammatory drug. See http://www.drugs.com/bextra.html.

plaintiff was experiencing some discomfort as a result of doing yard work; Dr.
Joselevitz told him that he would have some pain, but that he needed to increase
his activity level.  Id. at 151.  On June 19, 2003, plaintiff had begun walking
around the block, and was doing a home exercise program.  Id.

On July 18, 2003, plaintiff stated that the medications were helping to
control the pain, and that he was trying to be as active as possible.  Id. at 149.  That
report also notes that plaintiff was given a whole person impairment rating of
thirteen percent on December 4, 2001.  Id.  On August 18, 2003, plaintiff reported
that his pain was a three with medication, but a six without it.  Id. at 148.  He still
needed the cane to walk because of the pain.  Id.  On October 14, 2003, plaintiff
reported walking about a mile each day.  Id. at 146.  His pain level was a five,
without medication, but using his TENS unit.  Id. at 146.  Plaintiff thought that the
TENS unit helped more than the medication did.  Id.  On November 13, 2003,
plaintiff's pain level was a three.  Id.  His TENS unit was helping significantly
with the pain, and he was advised to be active and walk as much as possible.  Id.

**C.    The July 27, 2006 Administrative Hearing.**

On July 27, 2006, the ALJ held a hearing on plaintiff's disability status.  Id.
at 573.  Chester Brown of Heard & Smith, LLP represented plaintiff.  Id.

7

Plaintiff testified that he was born on July 14, 1955.  Id. at 578.  He is a high school graduate, id., who worked at a local refinery as a pipefitter and boilermaker from about 1979 to about 1993.  Id. at 581.  He was incarcerated from around May 1993 to around May 1997.  Id.

In 1977, plaintiff injured his lower back in an automobile accident.  Id. at 582.  He was in therapy for this injury for approximately two years, and could not work during that time.  Id.  In 2001, plaintiff injured his right knee descending a ladder.  Id. at 583.  He had arthroscopic surgery on the knee in May 2001.  Id. at 586.  Plaintiff had fallen and re-injured the knee two weeks before the hearing.  Id. at 583.  He had also been suffering from pain in his left hip since around 1986.  Id.

Plaintiff testified that he still has pain in his back, especially in the winter.  Id. at 582.  This pain affected his ability to bend.  Id.  He gets dizzy and falls down occasionally, especially when in the sun.  Id. at 583.  In the four months prior to the hearing, pain in his left hip made it difficult to sleep.  Id.  He claimed to have lost most of the feeling in his feet.  Id. at 585.  At the time of the hearing, he weighed approximately 265 pounds; he claimed to have lost fifty pounds over the previous two years.  Id. at 586.

On June 24, 2006, plaintiff had surgery on four toes on his left foot.  Id. at 587.  He testified that his foot and knee pain kept him from fully participating in

8

church because he could not stand or kneel easily; he just sat through the service. Id. at 588. His recently diagnosed carpal tunnel syndrome made it difficult to use his cane. Id. at 589. Plaintiff thought he could stand for around ten or fifteen minutes before needing to sit down, and walk only 50 yards without rest. Id. at 591. This was due to pain in his hip, knee, and ankles. Id. He was able to pick up objects off the floor as long as they were not very heavy, but he had to use caution because of his problems with dizziness. Id. at 592. His doctor told him not to pick up more than 25 pounds due to his leg injuries. Id.

Plaintiff testified that his depression made him sad, but also caused him to lash out at his mother for no good reason. Id. at 590. He could not afford a psychologist, and his car was too undependable to attend free sessions at Texas A&M. Id. at 591. Plaintiff testified that, while at home, he spent most of his time watching television, or sulking in his room. Id. at 593. When he felt good, he might help his mother wash dishes. Id. Speaking directly to the ALJ, plaintiff said

> Your Honor, you know, the only think [sic] that I really
> want to say, Judge, is that I'm not, I'm not the same man
> I used to be, you know. As big as I am, I feel like
> nothing. If I go out in the sun, if I even walk or pick up –
> pick out a weed or something, I'm already going in like I
> want to fall down, you know. My doctor said that after
> this test they might take my driver's license away so – if I
> come out positive, I think, so I don't know, and after that
> they're going to give me some other test, depends so – I

came in here because I really need – but I need better
medical care than this.  These people I think they're just
going to do as far as they can.  The medications they've
been giving me.  The best that they have, you know, not
what my doctors prescribed.  Like for my glaucoma, after
I finish here my sister is going to take me to the
glaucoma specialist, and he prescribed Travatan, which
was working real good, but my clinic pharmacy doesn't
carry that, so they gave me the best thing they have, but
that's – if I don't qualify for disability, sir, that's up to
you.

Id. at 594.  Plaintiff went on to explain that glaucoma caused him blurred vision

and pressure in his eyes.  Id.

Plaintiff worked as a driver for KEDT public broadcasting for about two

months out of each year from 2003 to 2006.  Id. at 579.  He explained that, while

working as a driver, he was not able to load or unload the truck.  Id. at 595.  He got

the job through his brother.  Id.  He explained that the job was temporary, and

lasted for about two months before KEDT's auction.  Id. at 596.  Although

scheduled as a 9-to-5 job, sometimes plaintiff only worked three or four hours

because there was not enough to do.  Id. at 597.

Dr. Sharon L. Rogers, the medical expert, testified next.  She opined that

plaintiff did not meet or equal the criteria for any of the listed psychological

impairments.  Id. at 600.  After recounting the medical records, she explained that

she did think his concentration and memory were moderately impaired.  Id. at 605.

10

However, this was not unusual for people who had medical problems and had lost their job, as plaintiff had.  Id. at 606.

The ALJ then posed the following hypothetical to the vocational expert:

> He just turned 51 here this month, and he has a 12th grade education and a few credit hours here at Del Mar College.  His past work is more specifically delineated in exhibit 1E, and as he testified here to this date just a few months a year he works with delivery for the past three years, and as for the exertional limitations I'm going to have him doing no long-term continuous walking more than 50 yards at one time as indicated.  For this hypothetical, he said he could lift 20 to 25 pounds.  I'm going to restrict it to 20 pounds occasionally and 10 pounds frequently and for this hypothetical I'm going to impose a requirement that he do no balancing as a condition of employment, nor should he be required to climb ladders, ropes, or scaffolds and work at unprotected heights.  And I'm going to also add that he could for this hypothetical stand and walk six of eight, sit six of eight with the normal break periods.  I'm going to restrict any type of work he could do to more of a simple routine type of activity as, as opposed – and, and the work would have to be of moderate concentration only, not highly detailed, nor highly complex....

Id. at 607.  The vocational expert did not think he could perform past relevant work.  Id. at 608.  He opined that plaintiff could perform unskilled, light work as a hand packager, a sorter, or a retail marker.  Id. at 608.  He testified that there were respectively 7,000, 2,600, and 7,700 such jobs available at the state level.  Id.  The

11

SVP[8] levels on these jobs were one or two.  Id.  Plaintiff would be subject to

termination, however, if he missed more than two days per month.  Id. at 609.  He

would also be terminated if he could not work a full forty-hour week because he

needed to rest, or was otherwise unable to work the entire workday.  Id. at 609-10.

**D.     The ALJ's Decision**.

On August 21, 2006, the ALJ issued an unfavorable decision.  Id. at 13.  The

ALJ first found that plaintiff's disability status prior to August 29, 2003 was

res judicata because of a prior unfavorable decision.  Id. at 15.  However,

plaintiff's insured status continued through September 20, 2007.  Id. at 17.

Plaintiff had not engaged in substantial gainful activity since his alleged onset date

of May 4, 2001.  Id. at 18.

The ALJ found that plaintiff suffered from several severe impairments:

diabetes, hypertension, depression, chronic back and knee pain, glaucoma, and left

foot pain.  Id.  However, none of the impairments met or exceeded a listed

impairment.  Id. at 21; see also 20 C.F.R. § 404, Subpt. P, App. 1.  The plaintiff did

not require further orthopedic treatment, or surgery, for his knee.  Id.  Furthermore,

---

[8] "SVP" means "Specific Vocational Preparation."  Jobs at SVP level one are learnable with only a short demonstration, while those at SVP level two require up to one month to learn. See United States Department of Labor Dictionary of Occupational Titles, Appx. C (4th ed., rev. 1991) [hereinafter "DOT"].  Available at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES /DOTAPPC.HTM.

plaintiff had recovered from past treatment, and was able to walk without "the

assistance of any device." Id. Therefore, his condition did not meet or exceed the

listed criteria for joint dysfunction, or soft tissue injury. Id.; see also 20 C.F.R.

§ 404, Subpt. P, App. 1, §§ 1.02, 1.08.

>        As for plaintiff's back, the ALJ reasoned that

>> Records indicate the claimant has cervical spine
>> herniated discs at the C5-6 and C6-7 levels. He was
>> treated conservatively by his treating physician and while
>> surgery was recommended, this was never accomplished.
>> He had pain complaints of the neck and back in 2003 and
>> 2004, but his [sic] was never hospitalized for specific
>> treatment. He was also treated in a pain clinic and his
>> diagnosis remains chronic back and knee pain.

Id. at 22. Therefore, plaintiff did not meet or exceed the criteria for any spine

disorder in listing 1.04. Id.

>        He also found that plaintiff did not suffer from a vision impairment as

defined by listing 2.00, because

>> Records establish that claimant was examined in 2004
>> and 2005 for vision complaints and no abnormalities
>> were found. Later, in May 2005, he was diagnosed with
>> glaucoma. There are no records regarding this diagnosis.
>> Nevertheless, he is treated with eye drops. Surgery has
>> not been considered and he has good vision.

Id. He found plaintiff's hypertension did not meet the criteria for listing 4.03

because it "is under good control," and "there is no indication that [petitioner] has

a problem." Id.  Plaintiff's diabetes did not meet the criteria for listing 9.08

because, although it was "hard to control," "there is no evidence of any end organ

damage as a result...." Id. at 23.  Finally, the ALJ found that, although plaintiff's

depression caused "mild difficulties in maintaining social functioning," and

"moderate difficulties in maintaining concentration, persistence, and pace," it

caused "no limitations in performing activities of daily living," and therefore was

"not significantly limiting." Id.  Therefore, plaintiff's depression did not meet the

criteria of listing 12.04.  Id.

The ALJ found that plaintiff's residual functional capacity permitted him to

> lift and carry 20 pounds on occasion and 10 pounds on a
> frequent basis.  He can stand/walk 6 hours in an 8-hour
> workday, but cannot do any long-term continuous
> walking of more than 50 yards.  He can sit 6 hours in an
> 8-hour workday with normal breaks.  He can
> occasionally climb stairs and ramps, stoop, kneel, crouch,
> and crawl.  He cannot balance and cannot climb ladders,
> ropes, or scaffolds.  He can understand, remember, and
> carry out detailed but not complex instructions, make
> decisions, attend and concentrate for extended periods,
> accept instructions and respond appropriately to changes
> in a routine work setting.

Id. at 24.  The ALJ concluded that while plaintiff's medical impairments could

reasonably be expected to produce the alleged symptoms, plaintiff was not credible

on their intensity, persistence, and limiting effects.  Id.  He wrote that

14

> The undersigned finds that the medical evidence and
> other evidence do not support the claimant's allegations
> as credible to the extent alleged.  He has a history of
> treatment for multiple medical conditions that have not
> required any extensive follow-up....  He was hospitalized
> for a short period to investigate rectal bleeding that was
> found to be inconclusive by diagnostic studies.  He was
> treated for internal hemorrhoids and has not had any
> further problems.  He was treated for vertigo and it was
> believed due to orthostasis (caused by standing erect).
> Further evaluation was recommended (audiogram/CT
> head scan).  These apparently were not done.  The
> claimant has not reported any ongoing vertigo problems
> since the initial examination....  His eye examinations
> have been normal, although records indicate he is treated
> with eye drops for glaucoma.  He does not report any
> visual problems.  Also, complaints of left foot pain have
> been addressed and no problems diagnosed.  His
> depression appears to be situational in nature and he has
> not required any extensive treatment.

Id. at 25.  He agreed with the state agency consultants' opinions that the "evidence

did not show his ability to perform basic work activities was as limited as he had

indicated and because his symptoms were not severe enough to be considered

disabling under the Social Security guidelines."  Id.  The ALJ explained that

> Basically, the claimant has been treated and monitored
> for his diabetes and high blood pressure along with his
> other minor complaints.  He is able to function normally.
> He has helped his mother with redecorating her home and
> while he has complained of pain, he has not experience
> [sic] any significant pain.  He continues to complain of
> back and knee pain, but he has also worked part time and
> he has been encouraged to continue working part-time as

15

> noted in progress notes.  The undersigned finds that the
> record evidence fails to support the claimant's subjective
> complaints, including pain and depression, of such
> severity as to be disabling under the Regulations for
> determining disability.  He remains active and is
> followed on a routine basis.

Id.  However, the ALJ did find that plaintiff was unable to perform his past

relevant skilled heavy work as a pipefitter and boilermaker.  Id.

The ALJ then made the findings necessary to use the medical-vocational

guidelines, or "grid rules," as a framework for determining whether plaintiff could

perform work present in the national economy in substantial numbers.  Id.;

see also 20 C.F.R. 404, Subpt. P, App. 2.  Plaintiff was "an individual closely

approaching advanced age" under the regulations.  Id.; see also 20 C.F.R.

§§ 404.1563, 416.963.  He has a high school education, and is able to communicate

in English.  Id. at 26.  Transferability of job skills was not material because

plaintiff was "not disabled" regardless of whether he possessed transferable job

skills.  Id.

Under the grid rules, an individual like plaintiff who can perform light work

is not disabled.  Id.  The ALJ determined that plaintiff's limitations prevented him

from performing the full range of unskilled, light work.  Id.  However, the ALJ

relied on the vocational expert's testimony to conclude that plaintiff could

16

successfully perform the light work required of a hand packager, sorter, and retail worker.  Id.  Accordingly, the ALJ found that plaintiff had not been under a disability as defined by the Social Security Act since his alleged onset date.  Id. at 27.

### III.  LEGAL STANDARDS

**A.     Social Security Act Benefits Requirements.**

The Social Security Act establishes that every individual who is insured for DIB, has not attained the set retirement age, has filed an application for disability benefits, and is under a disability is entitled to receive disability benefits.  42 U.S.C. § 423(a)(1).  Lower-income individuals who are aged, blind, or disabled are entitled to SSI payments.  42 U.S.C. § 1381a.  The same law and regulations govern whether an individual is considered disabled, and therefore, entitled to either DIB or SSI benefits under the provisions of the Social Security Act.  Haywood v. Sullivan, 888 F.2d 1463, 1467 (5th Cir. 1989) (per curiam) (citations omitted).  A person is under a disability when he cannot "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Act establishes that a claimant is not disabled

17

if that person can perform jobs available in the national economy:

> An individual shall be determined to be under a disability
> only if his physical or mental impairment or impairments
> are of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of
> substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific
> job vacancy exists for him, or whether he would be hired
> if he applied for work.  For purposes of the preceding
> sentence ... "work which exists in the national economy"
> means work which exists in significant numbers either in
> the region where such individual lives or in several
> regions of the country.

42 U.S.C. § 423(d)(2)(A).

## B.    Social Security Administration Regulations And Rulings.

The Social Security Administration uses a five-step sequential process to determine if an individual suffers from a disability.  20 C.F.R. § 404.1520.  A disability finding at any point in the five-step process is conclusive and ends the analysis.  Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990) (citation omitted). A claimant bears the burden of proof on the first four steps.  Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994) (per curiam).  A claimant must prove that (1) he is not presently engaged in substantial gainful activity; (2) he suffers from an impairment or impairments that are severe; and that either (3) the impairment

meets or equals an impairment listed in the appendix to the regulations; or (4) due to claimant's Residual Functional Capacity ("RFC"), the impairment prevents the claimant from doing past relevant work.  20 C.F.R. § 404.1520(a)(4); see also Bowling, 36 F.3d at 435; Villa, 895 F.2d at 1022.

The Fifth Circuit has held that "[t]he first two steps involve threshold determinations that the claimant is not presently engaged in substantial gainful activity and has an impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities."  Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000).  The Commissioner may find that a claimant's impairment fails to meet the significant limitation requirement "'only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'"  Id. at 391 (quoting Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985)).

Step three requires a claimant to prove that her impairment meets one or more of the impairments listed in the regulations.  See 20 C.F.R. § 404, Subpt. P, App. 1.  The list includes both physical and mental impairments.  The criteria for mental impairments take into account whether there is marked interference with activities of daily living, social functioning, concentration, persistence, or pace,

19

and whether the claimant has suffered repeated episodes of decompensation.  20

C.F.R. § 404, Subpt. P, App. 1, Part A § 12.00(C).  The regulation defines

"episodes of decompensation" as "exacerbations or temporary increases in

symptoms or signs accompanied by a loss of adaptive functioning, as manifested

by difficulties in performing activities of daily living, maintaining social

relationships, or maintaining concentration, persistence, or pace."  Id. at Part A

§ 12.00(C)(4).  The claimant must present evidence that the impairment is a long-

term problem rather than a temporary set-back, but "does not have to show a 12

month period of impairment unmarred by any symptom-free interval."  Singletary

v. Bowen, 798 F.2d 818, 821 (5th Cir. 1986) (citations omitted).

        Under the fourth step, if necessary, a claimant who is unable to show that his

impairment meets one of the listed impairments must show that he is unable to

perform his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The

Commissioner considers the claimant's RFC in making this determination.  Id.;

see also 20 C.F.R. § 404.1545.  The RFC describes the most a claimant can do

despite any limitations caused by an impairment.  20 C.F.R. § 404.1545(a)(1).  The

Commissioner is to take all relevant record evidence, including medical and non-

medical evidence, into consideration when making an RFC determination.  20

C.F.R. § 404.1545(a)(3).

If the claimant makes the required step four showing, the burden shifts to the Commissioner to determine, based on the claimant's RFC, age, education, and work experience, whether the claimant can make an adjustment to other jobs present in the national economy in significant numbers.  20 C.F.R. § 404.1520(a)(4)(v).  If he cannot make such an adjustment, the claimant is disabled.  Id.

## C.    Judicial Review Of The ALJ's Decision.

Judicial review of the Commissioner's denial of DIB is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision complies with relevant legal standards.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000) (citations omitted).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Carey, 230 F.3d at 135 (citation omitted).  The Fifth Circuit has described this burden as more than a scintilla, but less than a preponderance.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).  A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988) (per curiam) (citation

omitted).

In applying the substantial evidence standard, courts are to scrutinize the record to determine whether such evidence is present.  However, they may not reweigh evidence, try issues <u>de novo</u>, or substitute their own judgment for the Commissioner's.  <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).  Factual conflicts in the record are for the Commissioner to resolve, not this Court.  <u>Masterson v. Barnhart</u>, 309 F.3d 267, 272 (5th Cir. 2002).  The Court, like the ALJ, must consider the evidence as a whole and take into account the following factors: "1) objective medical facts; 2) diagnoses and opinions of treating and examining physicians; 3) claimant's subjective evidence of pain and disability; and 4) claimant's age, education, and work history."  <u>Wren v. Sullivan</u>, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam) (citation omitted).

## IV.  DISCUSSION

Plaintiff argues that the Commissioner's decision is not supported by substantial evidence, and that he has not applied the proper legal standards to plaintiff's claim.  (D.E. 1, at 2).  More specifically, he contends that the ALJ erred in concluding that plaintiff was capable of light work, because he cannot walk more than fifty yards without rest, and because he uses a cane to walk.  (D.E. 12, at 5).  Because plaintiff is not capable of light work, he reasons, the grid rules support

22

a finding of "disabled."  Id. at 5.  He also argues that the ALJ erred by not positing

an individual requiring a cane to walk in his hypothetical to the vocational expert.

Id. at 6.  According to plaintiff, the Commissioner therefore failed to carry his step-

five burden of proving that he is capable of performing work available in the

national economy.  Respondent argues that plaintiff was not prejudiced by the

ALJ's failure to include a cane requirement in his hypothetical.  (D.E. 13, at 3).

**A.     The ALJ's Finding That Plaintiff Did Not Require A Cane To Walk
Does Not Comply With Relevant Legal Standards.**

Federal regulations require the Commissioner to evaluate every medical

opinion received, regardless of its source.  20 C.F.R. § 404.1527(d).  When

weighing medical opinions, the Commissioner is required to consider a number of

enumerated factors unless he gives controlling weight to the opinion of a treating

source.  Id.  A treating physician's medical opinion is entitled to more deference

than another physician's opinion.  20 C.F.R. § 404.1527(d)(2).  Unless

contradicted by the opinion of another treating or examining physician, an ALJ

may reject a treating physician's opinion only if the ALJ performs a detailed

analysis of the criteria in 20 C.F.R. § 404.1527(d)(2).  Newton v. Apfel, 209 F.3d

448, 453 (5th Cir. 2000).  When an ALJ gives a treating source's opinion

controlling weight, he does not have to consider the enumerated factors in

23

weighing other opinions.  20 C.F.R. § 404.1527(d).

Plaintiff was originally prescribed a walking cane for his knee pain on March 25, 2003.  AR at 153.  Dr. Joselevitz, who had been treating plaintiff for his knee pain since August 15, 2001, considered the cane to be medically necessary. Id.  On December 18, 2003, the state agency physician did not check the box indicating that plaintiff needed a "hand-held assistive devices" to walk.  Id. at 201. On March 13, 2004, the independent reviewer confirmed this assessment.  Id. at 200.  However, the record does not show that Dr. Joselevitz ever felt that plaintiff was well enough to walk without a cane.

In his decision, the ALJ writes only that plaintiff "had been using a cane to walk, but he improved and later did not require any assistive devices to walk."  Id. at 18.  The ALJ does not explain how he reached this conclusion.  He was not entitled to reject plaintiff's treating physician's opinion without detailed analysis pursuant to 20 C.F.R. § 1527(d)(2)-(6).  His decision does not do so.  Accordingly, it is respectfully recommended that the ALJ's decision does not comply with relevant legal standards.

## B.    The ALJ's Error Prejudiced Plaintiff's Rights.

The Fifth Circuit has determined that district courts reviewing DIB denials must apply a harmless error analysis.  Audler v. Astrue, 501 F.3d 446, 448 (5th

24

Cir. 2007) ("Having determined that the ALJ erred in failing to state any reason for her adverse determination at step 3, we must still determine whether this error was harmless.") (citing Morris v. Bowen, 864 F.2d 333, 334 (5th Cir. 1998) (per curiam)). The Audler court further explained that "'[p]rocedural perfection in administrative proceedings is not required' as long as 'the substantial rights of a party have not been affected.'" Id. (quoting Mays v. Bowen, 837 F.2d 1362, 1564 (5th Cir. 1988) (per curiam)).

Plaintiff's substantial rights were affected because the ALJ's failure to recognize his need to use a cane casts doubt on the ALJ's conclusion that plaintiff could perform light work. The ALJ found that plaintiff was "closely approaching advanced age," had a high school education, and was able to communicate in English. AR at 25-26. He did not determine whether plaintiff had any transferable job skills, because "using the Medical-Vocational Rules as a framework supports a finding that claimant is 'not disabled,' whether or not the claimant has transferable job skills." Id. at 26; see also 20 C.F.R. § 404, Subpt. P, App. 2, § 202.13.[9] The ALJ found that plaintiff was able to perform a restricted range of light work and applied the corresponding grid rule. However, light work requires the claimant to

_____

[9] The ALJ's citation to rule 202.20 is apparently an error, as it applies to "younger individuals." See AR at 26. Rule 202.13 is the most analogous rule applicable to persons "closely approaching advanced age."

be able to walk reasonably well.  Thus, if plaintiff were found capable of only

sedentary work, Medical-Vocational Rule 201.12 would support a finding of "not

disabled."  Id. at § 201.12.

The Social Security Administration has issued guidance for when a

claimant's RFC falls between two Medical-Vocational rules that direct opposite

conclusions.  Specifically, it provides that

> a.  An exertional capacity that is only slightly reduced in
> terms of the regulatory criteria could indicate a sufficient
> remaining occupational base to satisfy the minimal
> requirements for a finding of "Not disabled."
>
> b.  On the other hand, if the exertional capacity is
> significantly reduced in terms of the regulatory
> definition, it could indicate little more than the
> occupational base for the lower rule and could justify a
> finding of "Disabled."
>
> c.  In situations where the rules would direct different
> conclusions, and the individual's exertional limitations
> are somewhere "in the middle" in terms of the regulatory
> criteria for exertional ranges of work, more difficult
> judgments are involved as to the sufficiency of the
> remaining occupational base to support a conclusion as to
> disability.  Accordingly, VS assistance is advisable for
> these types of cases.

SSR 83-12, 1983 WL 31253, at *2-3.  The Commissioner has explained that the

"major difference between sedentary and light work is that most light jobs –

particularly those at the unskilled level of complexity – require a person to be

26

standing or walking most of the workday." SSR 83-14, 1983 WL 31254, at *4.

The ALJ's hypothetical to the vocational expert did not posit an individual using a

cane to walk. AR at 607. Thus, the hypothetical did not fully capture the extent to

which plaintiff's impairments erode the light work base, because it did account for

the fact that plaintiff could use only one hand while walking and standing, at least

some of the time.

Furthermore, the vocational expert's testimony does not necessarily establish

the existence of light work that an individual using a cane could perform. The

vocational expert suggested three jobs in the national economy were within

plaintiff's RFC: hand packager, sorter, and marker. Id. at 608. A hand packager

job actually requires a medium exertional level. See DOT § 920.587-018;

accord Drayton v. Shalala, 9 F.3d 104, 1993 WL 481782, at *4 (5th Cir. Nov. 12,

1993) (per curiam) (unpublished). Therefore, it does not help support the ALJ's

decision. Furthermore, sorting and marking jobs both require extensive handling,

and could require two hands. See DOT §§ 529.687-186, 209.587-034. It is not

clear that plaintiff could actually perform either job.

Therefore, it is respectfully recommended that the Commissioner has not

carried his burden of showing that plaintiff can perform work which exists in the

national economy in substantial numbers. Accordingly, it respectfully

recommended that the ALJ's failure to correctly apply the relevant standards has prejudiced plaintiff's substantial rights.

## V.  RECOMMENDATION

It is respectfully recommended that plaintiff's cross-motion for summary judgment, (D.E. 12), be granted, that defendant's motion for summary judgment, (D.E. 10), be denied, and that the matter be remanded for further development. (D.E. 12, at 6).

Respectfully submitted this 12th day of February 2008.

_____
BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

28

<u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(C); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error*, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).